UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION at Hammond

| | |
|---|---|
| CHAD A. YOUNG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:24-cv-59-AZ |
| | ) |
| FRANK BISIGNARO, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter is before the Court on Plaintiff Chad A. Young's appeal of the Commissioner of the Social Security Administration's (the "Commissioner") denial of disability benefits.[1] For the reasons discussed, the Court agrees with Young that the Administrative Law Judge failed to pose a hypothetical to the vocational expert that included all of Young's mental limitations. Therefore, the Court will reverse and remand the matter for further administrative proceedings.

### Background

Plaintiff Chad A. Young was 50-years old at the alleged onset of his disability, which he claims was July 20, 2017. A.R. 21.[2] Young is a high school graduate who previously worked as a plasma cutter. A.R. 14, 21. He reportedly worked as a plasma cutter for six to eight years without issue, but in 2019 at a primary care appointment

---

[1] On November 5, 2024, both parties consented to the jurisdiction of the assigned Magistrate Judge for all purposes pursuant to 28 U.S.C. 636(c). *See* DE 14.

[2] Citations to the Administrative Record, filed at DE 9, are throughout as "A.R."

he reported that he been diagnosed with schizophrenia ten years prior. A.R. 21, 381. At this appointment, Young was screened for depression, which was rated minimal, and for anxiety, which was rated severe. A.R. 381. His prescriptions at the time included Zoloft, Wellbutrin, and Seroquel. *Id.* Following this appointment, Dr. Taraska replaced the Seroquel with Latuda. A.R. 385.

At a follow-up appointment, Young reported that he was still experiencing hallucinations while on Latuda but did not notice any side effects. A.R. 378. At his next appointment in July, Dr. Taraska switched the prescription from Latuda to Rexulti after Young complained he was feeling paranoid and irritable. A.R. 380. At his August appointment, Young reported doing well, so his medication regimen was unchanged. A.R. 375, 377. But then in October, he reported increased anxiety and depression, so Dr. Taraska increased the Zoloft dosage. A.R. 374. In November, Young again stated he was doing well. A.R. 369. In February 2020, Young reported a turn for the worse, as he began to wake up from nightmares, hear voices, and have panic attacks. A.R. 366. Dr. Taraska prescribed Prazosin for apparent Post Traumatic Stress Disorder (PTSD) symptoms. A.R. 368. While Young reported doing better in March 2020, a depression evaluation indicated moderately severe depression, and an anxiety evaluation indicated moderate anxiety. A.R. 362. By August 2020, Young reported having no issues. A.R. 355.

In March 2021, Young was given a consultative mental status examination by psychologist Jared Outcalt. A.R. 295. He reported more hallucinations and was feeling more depressed than normal. A.R.295-96. He further reported that he

2

experienced hallucinations that commanded him to commit self-harm. A.R. 296. Dr. Outcalt noted that Young appeared unclean, unkempt, and disheveled. A.R. 299. He diagnosed Young with depressive-type schizoaffective disorder, which involved episodes of lower functioning which could sometimes result in a decreased ability to make work-related decisions. A.R. 302.

In April 2021, Young met with Dr. Taraska again and said his anxiety and mood were improved. A.R. 342. One month later, though, he reported nightmares and hearing voices. A.R. 338. But Young felt stable from then until November, when he began struggling with anxiety again. A.R. 333. He was prescribed Buspar and by December felt improved again. A.R. 333, 330. By April 2022, Young switched from seeing Dr. Taraska to nurse practitioner Caleb Simmons. A.R. 326. He reported to Simmons moderate anxiety and depression, and more hallucinations. A.R. 328. Simmons assessed paranoid schizophrenia, anxiety, and PTSD. *Id.*

Young underwent a second consultative mental status examination with psychologist Elizabeth Rayl in June 2022. A.R. 305. She observed poor hygiene and difficulty concentrating. Young again reported hallucinations, and Dr. Rayl noted his symptoms were impacting social and occupational functioning. A.R. 308. At a July appointment with Simmons, Young reported no hallucinations but stated that he thought his neighbors were watching him. A.R. 322-23. Finally, at an October 2023 therapy appointment with Misha Bennett, she noted that Young's impairments were not an impediment to employment. A.R. 446. Specifically, she noted Young could

3

concentrate for two hours a day, did not require breaks, and could complete a normal workday and workweek. A.R. 444.

Young filed an application for Social Security Disability Insurance and Supplemental Security Income benefits on November 19, 2021. A.R. 196. In his applications, he alleged a disability onset date of July 20, 2017. A.R. 12. His claims were denied in the initial application, and upon reconsideration, and Young thereafter requested a hearing before an ALJ. A.R. 116-25, 134-41. On November 20, 2023, the ALJ held a telephonic hearing, and issued an unfavorable decision. A.R. 7. The Appeals Council denied his request for review, so Young timely appealed the matter to this Court. A.R. 1-3.

On January 31, 2024, the ALJ issued a written opinion denying benefits. A.R. 7. Because the Appeals Council denied review, the ALJ's written decision is the final decision for review by the Court. *See* 20 C.F.R. §§ 404.981, 416.1481. In that written decision, the ALJ followed the standard five-step process to determine whether Young was disabled. At step one, the ALJ determined that Young had not engaged in substantial gainful activity since the alleged onset date of July 20, 2017. A.R. 12.

At step two, the ALJ determined that Young suffered from the following severe impairments: "depression, anxiety, paranoid schizophrenia (20 CFR 404.1520(c) and 416.920(c))." *Id.* He determined these impairments significantly limited Young's ability to perform basic activities. *Id.* The ALJ found Young's other alleged impairments of obesity, asthma, and trouble sleeping to be non-severe, though he considered them in analyzing Young's mental health. *Id.*

4

At step three, the ALJ concluded that Young does "not have an impairment or combination of impairments that meet or medically equals the severity of" any applicable Listing which would presumptively entitle him to a finding of disability. A.R. 13. He did not find that Young had any severe physical impairments. *Id.* For his mental impairments, the ALJ considered them singly and in combination to see if they met the criteria of listings 12.03, 12.04, and 12.06. *Id.* To do so, he examined the "paragraph B" criteria, which require either one extreme limitation or two marked limitations in a broad area of functioning. *Id.* "An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis." *Id.*

The ALJ held that Young has a mild limitation in understanding, remembering, or applying information. *Id*. Though Young showed shortfalls in this area during his three consultative examinations, none of the examiners noted concerns about cognitive deficits. A.R. 13, 295, 305, 426. Records from his providers also assessed Young as having average intelligence. A.R. 13, 324, 329, 331, 334, 340. The ALJ also noted that while Young claimed to have been diagnosed with schizophrenia ten years prior to 2019, he worked in a skilled position as a plasma cutter from 1999 to 2017 seemingly without issue until being fired as a result of sexual harassment allegations. A.R. 14, 382.

The ALJ determined Young has a moderate limitation in interacting with others. A.R. 14. Part of this determination is based on Young's allegations of paranoid

5

delusions, problems with crowds, and problems around people he does not know. *Id.* The ALJ did note that at his numerous examinations, Young was cooperative, and his interactions were "largely unremarkable." A.R. 14, 295-400, 426-29. Additionally, Young stated to providers he maintains good relationships with family and records suggest compliance with therapy. A.R. 14.

In concentrating, persisting, or maintaining pace, the ALJ held Young has a moderate limitation. *Id.* While the ALJ acknowledged Young's allegations of disruptive delusions and hallucinations, he believed Young's position as a plasma cutter for such a long time without issue cuts against this limitation. *Id.* The ALJ did note that Young has been consistent in claiming that general interaction with others triggers his symptoms, and his plasma cutter position was mostly done alone. *Id.*

The ALJ found a moderate limitation in adapting or managing oneself. *Id.* While Young testified to leaving his job by threatening suicide, the ALJ notes that Young seems to have long periods of stability and appears to follow treatment plans. *Id.* A lack of psychiatric hospitalizations, referrals to higher levels of care, or instances of noncompliance also support a lower level of limitation. *Id.* A therapist also noted that Young appears stable with a fair to good prognosis. A.R. 14, 443-46. Because the ALJ did not find two marked limitations or one extreme limitation, "paragraph B" criteria were not satisfied. A.R. 15.

At step four, the ALJ determined Young's Residual Functional Capacity (RFC) as follows:

> [P]erform[ing] a full range of work at all exertional levels but with the following nonexertional limitations: he can have no concentrated exposure to dust, odors,

6

> fumes or pulmonary irritants. The claimant can perform simple, routine tasks, interact with coworkers, supervisors and the public occasionally. He can make simple, work-related decisions.

A.R. 15. The ALJ stated, as is standard, that he "considered all symptoms … as consistent with the objective medical evidence and other evidence" in arriving at this RFC. *Id*. The ALJ further explored the medical evidence and the severity of Young's impairments. *Id*. He considered the record in comparison to the intensity, persistence, or functionally limiting effects of Young's symptoms. *Id*.

Specific consideration of mental examinations demonstrated the reasoning behind the ALJ's conclusion of only a moderate limitation in Young's mental functioning. The ALJ agreed with Young's testimony that his impairments could be expected to cause the alleged symptoms, but found Young's statements concerning the intensity, persistence, and limiting effects of the symptoms to not be entirely consistent. A.R. 16. For example, Young alleged the disability started in 2017 when he was fired from his job, but there are only medical records starting in 2019. *Id*. Further, Young's own allegation of stability while being treated for schizophrenia for ten years diminishes the supposed effect of the impairments. *Id*. At numerous appointments, outlined above, Young reported "feeling good" and providers found the appointments generally unremarkable. A.R. 17. Young also repeatedly stated his hallucinations were easily ignored. *Id*. While at his second consultative examination, though he had difficulty with "abstract reasoning, similarities and concentration," and poor judgment, Young's thought process was logical, sequential, and pertinent to the topic. A.R. 17, 307. Later records showed further stability in July 2022, and he

7

felt that his medication was working. A.R. 18, 322. A mini mental health examination with Dr. Rathod was "completely normal." A.R. 18, 407.

In examining the record, the ALJ determined Young should be limited in interaction with others and should focus on simple, routine tasks. A.R. 18. He found the state agency mental consultant examinations generally persuasive. A.R. 19. However, Young's treating physician observed him over many years and found Young has fewer limitations in interaction with others than the state agency consultants did, so the ALJ found that opinion more persuasive. *Id.* The 2021 opinion from Dr. Outcalt was somewhat persuasive, who held that Young could make judgments on simple work-related decisions and could handle his own funds. *Id.* The ALJ found Dr. Outcalt's opinion on Young's "off task time" to be somewhat vague. *Id.* Dr. Rayl's 2022 opinion was generally supported by the exam findings and other opinions. *Id.* The ALJ held that Dr. Brown's 2023 opinion was unpersuasive. *Id.* He did not believe Dr. Brown provided specific functional limitations and was not probative as to residual functioning capacity. *Id.*

The ALJ found Young's therapist's opinion to be persuasive. *Id.* Ms. Bennett indicated that Young was stable and could test reality. *Id.* He could complete a normal workday and workweek and could carry out instructions. A.R. 19-20. Young did not exhibit inappropriate behavior such as outbursts or panic attacks. A.R. 20. She also found, similarly to Mr. Simmons and Dr. Taraska, that Young responded well to treatment plans and generally followed those plans. *Id.* The ALJ found the opinion from the consultative internal medicine examiner to be persuasive as well. *Id.* The

examiner noted that Young drove himself thirty minutes to the appointment, indicating no issues with concentrating. *Id.* Finally, the ALJ considered a report from Young's mother and found it consistent with the medical evidence. *Id.* His mother noted that Young spends time playing video games or listening to music, indicating good concentration, and appears to enjoy socializing more than he did before he became disabled. *Id.*

With this RFC in mind, at step four, the ALJ concluded Young could not perform any past relevant work. A.R. 20-21. His prior job as a plasma cutter is too high a skill level given his RFC and he is now limited to unskilled work. A.R. 21. However, based on the vocational expert's testimony, the ALJ determined unskilled occupations that exist in significant numbers in the national economy. *Id.* These jobs were floor waxer, packager, and dishwasher. *Id.* Because Young could adjust to other work in the national economy in line with his RFC, the ALJ determined that Young was not disabled. Accordingly, the ALJ subsequently denied Young's claim. A.R. 22.

## Discussion

The Social Security Act authorizes judicial review of a final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). A court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence, or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts

9

are to review agency factfinding." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citation omitted). "The threshold for this standard 'is not high.'" *Brace v. Saul*, 970 F.3d 818, 821 (7th Cir. 2020) (quoting *Biestek* 587 U.S. at 103). "Substantial evidence in this context means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting marks omitted).

Given this deferential level of review of agency decisions, the Court reviews the administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question is not whether the claimant is in fact disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

An ALJ must articulate their analysis of the evidence to allow the reviewing court to trace the path of their reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz*

10

*v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). An ALJ "has a basic obligation to develop a full and fair record and must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2019) (citations omitted). "An ALJ need not specifically address every piece of evidence," *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2014), but they likewise cannot ignore entire lines of evidence that undercut or contravene their conclusions. "Remand is necessary when it is unclear if the ALJ examined the full range of medical evidence, or if the court cannot trace the ALJ's path of reasoning." *Wolford v. Kijakazi*, 658 F. Supp. 3d 664, 668 (N.D. Ind. 2023) (cleaned up). The Court "cannot uphold an administrative determination that failed to explain the outcome adequately." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021) (citing *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010)).

Young argues a single narrow issue on appeal: the ALJ erred in failing to explain why he departed from the purportedly persuasive state agency psychologist opinions. DE 15 at 9. Specifically, Young argues the ALJ should have addressed the inconsistencies within the opinions, because the consultants' "checkbox limitations" did not fully comport with their narrative explanations. *Id.* at 11.

Young points to the opinions of Drs. Horton and Clark which suggest a limitation in following detailed instructions and adhering to a schedule. *Id.* at 10. Both doctors also noted a limitation in social interaction, with Dr. Horton indicating issues with supervisors, while Dr. Clark noted issues with coworkers. *Id.* at 10-11.

11

Young argues that the moderate limitations in these areas the doctors noted in the "checkbox" section of their report indicates that the ALJ should have found higher limitation in interaction in the RFC. Young believes the ALJ is required to explain his deviation from these reports even though he noted they were generally persuasive.

Young cites to a number of cases he believes supports his argument that the ALJ was required to explain away this deviation from the state agency consultants' opinions that he found generally persuasive. Notably, in *Varga v. Colvin*, 794 F.3d 809, 816, (7th Cir. 2015), the Seventh Circuit remanded a case due to an ALJ's failure to account for the six checkbox limitations noted by the consultant. Because the ALJ did not include these limitations in the hypothetical posed to the vocational expert, the court held that he had ignored them entirely. *Id*. However, this case presented a somewhat unique scenario, since the consultant explained her checkbox selections in narrative form, as is standard, but that section was lost. *Id*. The narrative was contained in an electronic attachment which could not be located and was not part of the record. *Id*. at 811. Because the ALJ could not rely on the narrative, which is generally more useful than then worksheet checkboxes, the ALJ needed to explain any departure from those selections. *Id*. at 816. In Young's case, the ALJ had access to the narrative explanation and could consider the consultants' reasoning when determining the RFC. A.R. 19. Thus, this argument is generally unpersuasive. The ALJ adequately explains why he departed from the state agency consultants' opinions. He found the primary physician's and therapist's opinions more persuasive

12

and noted multiple instances in the medical record that justified a lower limitation in the RFC. The Commissioner is correct in responding that even were this discrepancy to result in a remand, there is no reason to believe the ALJ would arrive at a different result.

However, this is not the end of the analysis. In a somewhat minor point in his opening brief and more prominently in his reply, Young also raises the issue of the hypothetical the ALJ posed to the vocational expert. DE 15 at 12-13, DE 22 at 1-2. Young notes that the second hypothetical posed to the vocational expert included the limitation of needing to spend 20% of the workday off task. A.R. 65. This, Young argues, shows the ALJ considered a higher limitation in interaction but neglected to include it in his written opinion, and offered no explanation for why he did so. This resulted in the ALJ determining an RFC which had only an occasional limitation in interaction. Young is correct that the Seventh Circuit has expressed skepticism when an ALJ poses a hypothetical with such a limitation but neglects to mention it in his written opinion. *Winson v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019). The Seventh Circuit has gone beyond mere skepticism, though, when an ALJ neglects to include all of the noted limitations in the hypothetical posed to the vocational expert.

"[Seventh Circuit] caselaw emphasizes that "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record," including even moderate limitations in concentration, persistence, or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). The ALJ has a duty to

13

ensure that the vocational expert is "apprised fully of the claimant's limitations." *Id.* (citing *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *DeCamp v. Berryhill*, 916 F.3d 671, 675–76 (7th Cir. 2019)). The mental limitations the ALJ included in his first hypothetical was "no more than simple, routine tasks and simple work related decisions. And may have only occasional[3] interaction with coworkers, supervisors, and the public." A.R. 64. The second hypothetical included up to 20% time off task. A.R. 65. But, as noted above, there were *four* mental limitations that the ALJ identified: mild limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation in concentrating, persisting or maintaining pace; and moderate limitation in adapting or managing oneself. A.R. 13-14.

An "ALJ generally may not rely merely on catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence or pace." *Crump*, 932 F.3d at 570 (7th Cir. 2019) (internal citations omitted). The ALJ generally captured Young's interaction limitation in his hypothetical. But the ALJ notably found Young's symptoms flare up when around other people and disregarded this finding in the hypothetical. And, on its face, the hypothetical does not address Young's other limitations in understanding, concentrating, or adapting. The Seventh Circuit has repeatedly rejected the use of "simple routine tasks" to "adequately capture[] temperamental

---

[3] The "occasional" aspect is what Young primarily objects to, but I have addressed that issue above. The ALJ is given deference on his determination based on the whole of the medical record.

deficiencies and limitations in concentration, persistence, and pace." *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014) (citations omitted). The ALJ points out Young's "deficits" in concentration, persistence, and pace, specifically that it "takes time" for Young to debunk his hallucinations. A.R. 14. This is supported by the record, as Dr. Horton's analysis concluded "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" is moderately limited. A.R. 83. The additional explanation section noted "diff. concentrating," with "diff." meaning difficulty. A.R. 84. The evaluation with Dr. Outcalt shows difficulty in tasks measuring concentration as well. A.R. 17.

This is not to say that the ALJ's conclusion of a moderate limitation was incorrect; that conclusion is clearly supported by substantial evidence. This issue is whether this limitation was explained in adequate detail to the VE. *See Lockett v. Saul*, 834 Fed.Appx. 236, 239 (7th Cir. 2020) (a claimant must point to specific evidence of a limitation in any of three CPP areas). The vocational expert cannot be expected to have independently reviewed the claimant's entire medical record and therefore must be provided all of the limitations supported by the record in the ALJ's hypothetical. The ALJ's hypothetical included vague generalities that encapsulate some of Young's limitations, but it certainly does not include all of them. Based on the ALJ's findings in this case, a moderate limitation in concentration, persistence, and pace was not sufficiently detailed by the phrase 'simple routine tasks' in the hypothetical posed to the VE. Without further detail, the VE cannot adequately describe the work available to an individual with Young's limitations. "This failure to

15

build an "accurate and logical bridge" between the evidence of mental impairments and the hypothetical and the mental RFC requires [me] to remand for further proceedings." *Id.*; *see also O'Connor–Spinner,* 627 F.3d at 620–21; *Craft,* 539 F.3d at 677–78.

## Conclusion

For the reasons discussed, the Court hereby **GRANTS** the relief requested in Plaintiff Chad A. Young's Opening Brief [DE 15] and **REVERSES** and **REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.

**SO ORDERED** this 29th day of September 2025.

> /s/ *Abizer Zanzi*
> MAGISTRATE JUDGE ABIZER ZANZI
> UNITED STATES DISTRICT COURT